<pre>
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF ARKANSAS
 2                        CENTRAL DIVISION

 3

 4    UNITED STATES OF AMERICA         )
      ex rel. STEVEN STEPANISHEN, and  )              PLAINTIFFS
 5    STEVEN STEPANISHEN, Individually )
                                       )
 6                                     )
      VS.                              )   NO. 4:20CV-414-BRW
 7                                     )
                                       )
 8    BEI PRECISION SYSTEMS & SPACE    )              DEFENDANT
      COMPANY, INC.                    )
 9
10

            ORAL DEPOSITION OF STEVEN STEPANISHEN
11

             MONDAY, FEBRUARY 12, 2024
12

               9:13 A.M. - 3:04 P.M.
13
14
15
16
17
18
19
20
21
22
23
24
25
                                              Page 1
</pre>

EXHIBIT 1

```
 1                        A P P E A R A N C E S
 2
        ON  BEHALF  OF  DEFENDANT:
 3
 4      Regina  Young,  Esquire
 5      Wright  Lindsey  &  Jennings,  LLP
 6      200  West  Capitol  Avenue
 7      Suite  2300
 8      Little  Rock,  Arkansas  72201
 9      ryoung@wlj.com
10
11
12      ON  BEHALF  OF  PLAINTIFF:
13
14      Sean  Short,  Esquire
15      Sanford  Law  Firm,  PLLC
16      10800  Financial  Centre  Parkway
17      Little  Rock,  Arkansas  72211
18      sean@sanfordlawfirm.com
19
20
21      ALSO  PRESENT:
22
23      Cory  King
24
25      Randy  Schoening  -  Videographer
```

Page 2

1    Q.   And then, on the first page of Exhibit number one, you

2    worked for BEI from July of 1998 to - - it says May of 2020, but

3    that's not correct is it?

4    A.   I'm noticing a couple of typos on this.

5    Q.   What other typos are you noticing?

6    A.   The name BEI Precisions.  That should be BEI Precision.

7    Q.   Okay.  What about the job duties that you have written out

8    here on your CV, are those accurate?

9    A.   Yes.

10   Q.   So your employment with BEI began in 1998?  Is that right?

11   A.   Yes.

12   Q.   And you were terminated on March 5th of 2020?

13   A.   Correct.

14   Q.   Have you worked anywhere since March 5th of 2020?

15   A.   No.

16   Q.   What have your sources of income been since you were

17   terminated from BEI?

18   A.   Living off my savings and my 401k.

19   Q.   Do you have income from any other source?

20   A.   No.

21   Q.   I understand that you buy and sell vintage cars.  Do you do

22   that?

23   A.   No.

24   Q.   Are you disabled?

25   A.   No.

Page 13

1    committed this fraud?

2    A.    It was in 2019.  In the late summer, early fall.

3    Q.    And how did you arrive at that conclusion?

4    A.    I was working as a reliability engineer, I was actually the

5    manager of the reliability department.  However, I was the only

6    person in the department, and I was in charge of conducting

7    failure analysis on space encoders that had failed or components

8    that had test issues or failures.  And the NanoSeries encoders

9    were going into production for a number of new customers, or new

10   contracts and we started having a number of failures, both at

11   the piece part component level, as well as at the encoder level.

12   There were at least two components that were failing and there

13   were at least three or four encoder failures - - different

14   failures.  And during my investigation, one of the failures

15   involved the NASA Solar Cal encoder contract, where the signals

16   that are generated from the code disk, they weren't the right

17   levels, they weren't - - they weren't correct to produce the

18   correct output and I had to write the failure analysis on that.

19   And during my failure investigation, one of the things I do is I

20   talk to the engineers who designed it - - worked on it, to get

21   their feedback.  And during that discussion, he was completely

22   unsure of why it was failing.  He didn't know why the signals

23   were out of whack.  And they had made a couple of changes at

24   that time.  They thought it was the op amps inside the read head

25   of the encoder, and I believe they changed it to a different op

Bushman Reporting                    800-556-8974
A Veritext Company                   www.veritext.com

1    amp and it had the same problem.  And as a person has to do the
2    failure investigation and write the report, I have to provide
3    the root cause of the failure, I had to explained what happened.
4    And the engineer couldn't explain why it was happening.  I
5    couldn't explain why it was happening.  And I simply asked,
6     Well, have we ever tested one of these before?   And he said,
7     No.   I said,   What do you mean, you've never tested one of
8    these before?   Typically, what happens at BEI is when we get an
9    encoder contract, they'll create an engineering model, or a
10   prototype and they'll build it and they'll run it through a
11   series of tests and verifies performance.  And at that point,
12   they'll also debug it.  If the signals aren't correct, they'll
13   make adjustments to the circuit.  And all this is done to make
14   the design complete - - mature the design, basically.  These
15   optical encoders are very finicky devices.  They're extremely
16   precise measuring devices.  And the way the output of these
17   encoders is developed is there's an optical signal that is shot
18   - - shoot - - shot through a code disk that has a printed
19   pattern on it and photo cells pick up those signals and they get
20   amplified and manipulated, added, subtracted.  They do the math
21   to them and outcomes a position - - binary code for position.
22   And because there's a physical nature to it, you know, there's
23   an alignment, it is distances between the read head and the code
24   - - all these optical measurements, reflections, things like
25   that, your optical signals that are picked up by the photo

Page 26

1    cells, sometimes not perfect.  So they can make adjustments, and

2    they always require adjustments.  Because the nature of the - -

3    the optical and the electrical make it so that - - your

4    alignments are never going to be perfect, you know, your

5    components are never going to be exactly - - give you the exact

6    same output.  So, you make adjustments, you know, you put

7    different bias resistors in there, so forth.  So, when he told

8    me that they had never tested one before, I was like,  How can

9    this be?  We're selling these things.  How can we sell them if

10   we've never made one?   I didn't believe him.  It didn t seem

11   reasonable.  So I went to the engineering manager, Jim Dyer, and

12   I asked him, I said,  Jeremy just told me that we never made

13   this before, is that true?   He said,  Yeah, it's true.  We

14   never made one.   I said,  How do you expect it to work for

15   these customers if we've never debugged one before?   And he

16   goes,  I don't know, I asked management to fund an R and D Park

17   project so that we could build engineering models in the lab and

18   do the debugging.   They typically do, and his funding request

19   was denied.  And so he went back to management and told them,

20    We can't guarantee these things are going to work.  In fact,

21   they most likely won't when they re first built, until you go

22   through the debugging process.

23   Q.    Which is what you were doing.

24   A.    No, I was actually doing a failure analysis on a product we

25   were going to ship to a customer.  It is a difference.

Bushman Reporting          800-556-8974
A Veritext Company        www.veritext.com

1    Q.    What is that difference?

2    A.    Well, when you have a product that you're going to sell at

3    the front end of the stage, you have product development.  You

4    make the product, you test it, you verify it works.  Once you

5    get it working and optimize, whatever, you can sell it.  And

6    then you take that design, and you start to copy it.  Those work

7    because it s based off what you've already debugged.  What BEI

8    did was they didn't bother with the debugging portion.  They

9    sold these units without building, testing, verifying their

10   performance.

11   Q.    Well, what were you doing?  I thought you were - -

12   A.    Well - -

13   Q.    - - testing and verifying their performance?

14   A.    No, I - - I'm doing a failure analysis.  I'm trying to

15   figure out why this has failed.

16   Q.    Okay, right.

17   A.    So it's - - it's - - it's different.

18   Q.    How's it different?

19   A.    It's supposed to work, when I - - when it comes to me,

20   before it gets - - when it goes in to test, in the build, it s

21   supposed to be working.  It's supposed to be - -

22   Q.    What's your role?  I mean, if it's supposed to work, why

23   have a failure - - why have a reliability engineer?

24   A.    Because reliability engineer only comes into play on an

25   item that's in manufacturing or tests for a customer; okay?

Bushman Reporting                    800-556-8974
A Veritext Company                   www.veritext.com

1    broke.  If it doesn't break, we go into the next test.

2    Sometimes it's a thermal vacuum test, where we put it into a big

3    chamber, they put a vacuum on it, like up in space, it's a

4    vacuum, and we go through more temperature cycling and do

5    electrical testing periodically through the cycling.  If that

6    passes, then we typically go and do another acceptance - -

7    electrical acceptance test with an accuracy test.  And when

8    that's done, paperwork that they have to do, the testing is

9    done.  Unless the contractor also calls for qualification

10   testing.  Which means we take another unit and we put it through

11   another series of tests - - there's a more rigorous test, it's

12   meant to really push the limits of what the environment is going

13   to - - it's going to live in.  That unit won't be used up in

14   space, because it's been thrashed during the testing.  But it's

15   - - it's - - it's a way to qualify the unit to say, Yes, it

16   passed all these tests at these higher levels than it will see

17   normally.  It s qualified for space.  It's good to go.  Like I

18   said, that unit will typically be delivered to the customer, but

19   they don't use it because they consider it to be stressed.  And

20   if there's a failure during any of that, the acceptance or the

21   qualification testing, that's when I come in.

22   Q.   Okay.  And as you come in and do your reliability analysis

23   - -

24   A.   Right.

25   Q.   Okay.  And you were in the process of doing your

Bushman Reporting                    800-556-8974
A Veritext Company                   www.veritext.com

```
1    A.   It wasn't - - yeah.  It wasn't a mature design.  It wasn't
2    ready for production.  It had not - - they're not showing it to
3    be a working unit.
4    Q.   By the time BEI completed it s testing, was it a completed,
5    working unit?
6    A.   I don't know.
7    Q.   You weren't there.
8    A.   Yeah.
9    Q.   Is there any other misrepresentation in Exhibit three?
10   A.   Well, yeah, on the - -
11   Q.   And if you look at the corner, it's really tiny, do you see
12   the Bates number?  It's in the gray part where it says Relator.
13   A.   Okay, there you go.  Yeah.
14   Q.   That helps.
15   A.   It says page - - does it say 11?  There s enough pages to
16   this book.  And I guess that says 11.
17   Q.   Relator 11?
18   A.   Yeah.  It shows that it is outside this diameter as part of
19   the part number, it shows a number of different sizes.  They
20   didn't build these - - they have - - they didn't do any
21   prototyping on all of these different sizes.  Because of the
22   nature of the product, the optical measurements, the distances
23   between things, when you change the size of a code disk, you
24   change the optical characteristics.  So if you had a schematic
25   design for like a three inch unit, and you just decided to
```

Page 36

1    levels.  BEI didn't have all the parts qualified at the time

2    these were released.

3    Q.   But when the product was delivered, it did have those

4    parts; or you just don't know?

5    A.   I don't know.

6    Q.   Because you weren't there?

7    A.   It failed before, you know, it failed when I got - - it

8    hadn't been delivered by the time I got fired.

9    Q.   Right.  When it was delivered, though, you can't say

10   whether it had those parts?

11   A.   I don't know.  I know that at the time that they - - they

12   advertised this, they didn't have all of it - - the parts

13   available to build this.

14   Q.   What were the contracts that BEI entered into for these

15   falsely advertised encoders?

16   A.   Several of them were for the next generation OPIR satellite

17   program.  There were a number of - -

18   Q.   You said next generation - -

19   A.   OPIR.

20   Q.   Okay.

21   A.   It stands for the overhead persistent infrared - -

22   Q.   You said several of them; several contracts?

23   A.   Yes.  For - - yeah, with - - there were several companies

24   creating parts of that satellite system.  Northrop Grumman had a

25   hand in it, and they requested NanoSeries from BEI for that.

Page 46

1   before you can consider it space qualified.  You can't just take

2   space qualified components and put them together and say it s

3   space qualified.  You have to get to the testing.  You have to

4   show that it passed all of the electrical tests and all of the

5   thermal vacuum tests and the vibration tests.  When it's done

6   with all that, it s space qualified.  So - -

7   Q.   But the contracts didn't call for space qualification, they

8   called for space qualified components.

9   A.   No, they - - they - - they - - they require space level

10  components and space level testing.

11  Q.   And how do you know that?

12  A.   Because I'm the one who has to review the documentation to

13  make sure that our test procedures and our components meet the

14  requirements of the customers specs.  So - -

15  Q.   And again, you don't know if a space qualified component -

16  - the device was ultimately delivered to the customer under

17  these contracts; do you?  Because you weren't there.

18  A.   No, I wasn't.

19  Q.   So you don't know?

20  A.   I don't know.

21  Q.   Okay.  What were the billing terms in these contracts?

22  A.   It was a firm fixed price that they would get paid a

23  specific amount per gutter.

24  Q.   The firm - -

25  A.   Firm fixed price.

Bushman Reporting                        800-556-8974
A Veritext Company                     www.veritext.com

1    A.   No.

2    Q.   All right.  At any time before you were terminated, did you

3    contact the government to report BEI s fraud?

4    A.   No.

5    Q.   Why not?

6    A.   Well, initially, it was because I didn't know if what

7    Steven Parker was telling me was true.  When I - - when I first

8    heard that we had not built these encoders before, or tested

9    them, from Jim Dyer, I went to Steve Parker and I told him I

10   said, you know,  We've got a problem, you know, we've got all

11   these Nsnoseries encoders that, you know, are in test and

12   they're all failing.  And as part of my malfunction report, I

13   need to list, you know, the root cause of the failure. And

14   engineering tells me that they've never built one of these,

15   we've never debugged one.  And, of course, that's a contributory

16   factor as to why they're failing because we never completed

17   design work on it to debug it.  And I'm going to have to list

18   that as a potential root cause and I said, I was a little

19   incredulous, I said,  How did - - how did we sell these to these

20   customers knowing that we hadn't finished the design work on

21   them since they're expecting mature designs that are low risk of

22   failure?  And he told me that he doesn't know why engineering

23   didn't build prototypes, because management funded them to do

24   so.  Okay, now I've got conflicting information.  And

25   eventually, I went back to engineering and I asked Jim Dyer, I

1    into a meeting with all the executives, and then I was fired.

2    Q.   And when did that conversation take place?

3    A.   Well, there were actually two conversations.  The first one

4    was back in October or November of 2019, when I first got

5    bombarded with all of the failures.  That initial conversation

6    was me just talking to Parker saying, you know,  Engineering

7    says that we ve never built these, why do we expect them to

8    work?   And it wasn't until January or February that I came back

9    a second time and said,  Listen, engineering has no idea why

10   these things are failing.  I can't write a malfunction report

11   that says they're failing, we have no idea.   And typically what

12   you would do is you would do - - what kind of testing did we do

13   on the prototype?  What's the difference between the one we have

14   working and the one that doesn't work?  Well, we didn't have one

15   that was working because they never built one.  And that's when

16   I went back and forth between Jim Dyer and him saying,  Listen,

17   these were never built, or tested, or verified to function.

18   Q.   You're saying they were - - they were - - they were never

19   designed to function?

20   A.   No, they were never fully designed.  You know, you can have

21   a concept of how to build a chair, you know, but until you build

22   it, you're not going to be able to say that when you sit on it

23   you're not going to land on the floor, right?  You have to test

24   it.  You have to be sure that it's functional.

25   Q.   Well people advertise their services all the time.

Page 62

1   Q.   Well I got this from your complaint, if you want to - - you

2   should have it in front of you.  Paragraph 32, it says,

3    Relators work for Defendant centered on quality and contract

4   assurance.  He made sure that products were testing the way that

5   they were supposed to, being produced the way they were supposed

6   to, and met the parameters of the production contract.

7   A.   Right.

8   Q.   And that was your job?

9   A.   Yes.

10  Q.   Okay.

11  A.   When it says contract performance, it means the - - the

12  engineering aspect of it.  The contract will require specific

13  test regimens, specific component pedigrees, specific

14  engineering items, and my job was to make sure that they were

15  implemented during the program.  So if we had to write a test

16  procedure for testing, I had to make sure it complied with the

17  contractual testing requirements.

18  Q.   And these conversations that you testified about before we

19  took a break with Steven Parker and - - was there another

20  gentleman?

21  A.   David Dam.

22  Q.   David Dam - -

23  A.   And Jim Dyer.

24  Q.   About the product failures that you were noticing with the

25  NanoSeries encoders, these conversations were taking place while

Page 65

1    you were doing your work as a reliability engineer; right?

2    A.    Yes.

3    Q.    And while you were doing your job to make sure that the

4    quality of the product matched what the customer wanted?

5    A.    It was part of my failure analysis.

6    Q.    Exactly.  Okay.  So I'm going to hand you what has been

7    marked as Exhibit number six, and I believe this would be

8    another one of those documents that you prepared and produced in

9    discover - - discovery.  And what I wanted to - - well, let me

10   ask you that - - this, did you prepare Exhibit number six?

11              (Whereupon, Exhibit 6 was introduced in to the record

12         and is attached here to.)

13   A.    It looks like it.

14   Q.    Okay, and so, at the bottom of - - closer to the bottom of

15   the first page of Exhibit number six, Relator 199, where it

16   says,  My job description and position at BEI.   That's what I

17   wanted to focus on here a little bit, where you've written out

18   your job description and position.  So if you turn to the second

19   page of Exhibit number two, see the first full paragraph where

20   it starts with,  RE , and is that - - was that your shorthand

21   for reliability engineer?

22   A.    Yes.

23   Q.    So it says,  RE s had oversight functions and acted as

24   gatekeepers to ensure every aspect of the end item, from part

25   selection, piece part procurement, the electrical and mechanical

Page 66

```
 1    design, manufacturing processes and procedures, and acceptance
 2    and qualification testing did not pose a reliability risk, and
 3    that all contractual and technical requirements were met.   And
 4    that was your job duty; right?
 5    A.   Yes.
 6    Q.   So you go on,  RE s would analyze and scrutinize the design
 7    to ensure the end item would perform without fault over the
 8    mission life of the space or satellite program.  And RE would
 9    evaluate perform source inspections at parts suppliers, vendors,
10    and test houses, witness testing, review test data, perform
11    reliability analysis to identify potential failure modes and
12    effects, calculate the probability of success, perform
13    electrical stress analyses, and ensure all the components were
14    compliant for space use.   And that was your job; right?
15    A.   Yes.
16    Q.   Okay.   And RE s main function was to ensure the products
17    we delivered were safe, robust, reliable, and met all the
18    customers requirements.   Correct?
19    A.   Yes.
20    Q.   And if our analysis reviews found something which presented
21    a reliability risk, like a design error or problems with the
22    processes or procedures, reliability engineers would require
23    design changes to be implemented.   Right?
24    A.   Yes.
25    Q.   Okay.   And you were doing your - - your - - your job on
```

Page 67

1    these nano - - NanoSeries encoders; is that right?

2    A.    Yes.

3    Q.    When you discovered these failures that we've talked about?

4    A.    Yes.

5    Q.    Okay.  Moving to the next paragraph,  Another major portion

6    of an RE s job was failure investigations, reporting and fault

7    isolation.  In the event of a testing anomaly or test failure of

8    a component or the end item, the RE leads to failure

9    investigation is the head of a failure review board.   Is that

10   right; that was your job?

11   A.    Yes.

12   Q.    In a failure investigation, the RE is responsible for

13   determining and performing the troubleshooting steps to isolate

14   the fault and determine the root cause of the failure.  After

15   the cause of the fault is found, the RE analyzes the relevant

16   circuits to determine which parts to replace.  The RE would

17   determine and define the steps to be taken to repair or rework

18   the unit, and then would determine any corrective actions

19   necessary to prevent reoccurrence.  The RE would generate a

20   technical report, called a malfunction analysis, an MA,

21   documenting the fault isolation, the cause of the failure,

22   rework, repair details, and corrective preventative actions,]

23   and submit the report to a failure review board consisting of

24   members from the BEI FRB team, and the customers FRB, for their

25   review and approval.   Those were your job duties; is that

Page 68

1     right?

2     A.    Yes.

3     Q.    Okay.  And again, as a reliability engineer, it was your

4     job to ensure that the NanoSeries encoders met the customer's

5     requirements; right?

6     A.    Yeah.

7     Q.    Okay.  And as the reliability engineer, if you did not

8     think that the product met the customer's requirements, you

9     would recommend design changes.

10    A.    Well, it s not if I thought, I would have to know.

11    Q.    Okay, if - - if you knew that a design change needed to

12    occur, that was your job?

13    A.    Yes.

14    Q.    Okay.  And if - - if - - if you knew that there needed to

15    be additional testing, that was your job to make those

16    recommendations?

17    A.    Yes.

18    Q.    And how did you communicate your recommended design

19    changes, or additional testing requirements - - how did you

20    communicate that?

21    A.    In the malfunction analysis report that I write.

22    Q.    And who does that report go to?

23    A.    It is - - so I - - I generate the report, and then it gets

24    signed off by other members of the BEI FRB team.  Which will

25    involve the program manager, the quality assurance engineer, and

Page 69

1    critical things about my performance that - - they weren't

2    legitimate and when I - - when I had asked for clarification on

3    many of the things that were happening, I was never given the

4    information, or told why the thing had happened.  A number of

5    odd things that were happening.

6    Q.   Well, let's - - let's start here.  I'd like to hear you

7    testify about all of your whistleblowing activities, so why

8    don't we start there and then you can tell me about the weird

9    things that happened after - - after you reported.  But let's

10   start with the first time you made a report.

11   A.   Like I said, I'm in charge of writing the malfunction

12   analysis, and as part of the malfunction analysis, I have to

13   come up with, how did the failure occur?  It could be lots of

14   different reasons.  Somebody could drop a hammer on it and break

15   something.  It could be a bad solder joint, or whatever.

16   There's a cause that results in the failure, and there were

17   several malfunctions on these NanoSeries that nobody could

18   explain.  There was a temperature cycling issue where we weren't

19   getting the right output at temperature.  The voltage levels

20   that we claimed that it would work at, it wasn't working at, you

21   know, if you give a voltage range of just - - say, I'm just

22   going to give you know - - it's not applicable to this - - was a

23   five to six volts, you know, BEI would have a test procedure

24   where we test it at five volts, and maybe we tested it five and

25   a half, and then when we tested it six.  Well, we're claiming

Page 76

```
 1    characteristics of the op amp they chose was slightly different
 2    than the op amp that they had initially used.  So they changed
 3    it out to the one they initially used, and it still didn't work.
 4    And it was at that point, I was like, I can't write this in my
 5    malfunction report because it sounds like gibberish.  It sounds
 6    like we have no idea what's going on, because we have no idea
 7    what's going on.  I said,  What was the original - - what were
 8    we expecting to get?  You know, he goes  Well, we - - you know,
 9    we never built one, so we don't know.  And I said,  How can you
10    expect it to work?  He goes  Well, talk to Jim.  And that's
11    when I went to talk to Jim, and Jim and I had a long discussion
12    about the funding - - the request for funding, to be able to
13    prove out the design, and that's when Jim told me that he made
14    it perfectly clear to management that, you know, this is
15    something we need to do to verify the functionality and it s
16    performance in these different sizes.  Because without - -
17    without that actual verification, the likelihood that they're
18    going to function is low, very low.  And that rang a bell with
19    me, you know, because I have to write something in my
20    malfunction report and I didn't want to have to write that we
21    sold the customer designed that we didn't expect would function,
22    okay?  And I had a duty of full disclosure, and that's what I
23    would have had to have written because it's the truth.  And I
24    knew that I was already under the microscope of HR and Parker,
25    for some unknown reason.  And I knew that if I had written that
```

Page 79

1    A.    No.

2    Q.    So you don't know what the conversations were about

3    debugging before?

4    A.    I know that the customers were looking for a mature design

5    that had a low risk, and would meet the delivery schedule,

6    because that was a - - that was communicated to us.

7    Q.    Communicated to who?

8    A.    To me, at least.  Because one of the problems we were

9    having with - - with the old custom designs were all the delays.

10   And I have a lot of interaction with our customers.  You know, I

11   do source inspections and we have source inspectors from those

12   companies come to BEI and that somewhat resident there.  You

13   know, they'll be there all day, they'll be working besides you,

14   you have conversations.

15   Q.    So at any point while you were having to - - while you were

16   doing your malfunction analysis and testing, did the customer

17   say  Hey, you've breached the contract, this is not what we

18   bargained for and we're canceling the contract.   That never

19   happened, did it?

20   A.    Not when I was there.

21   Q.    Okay.  And they knew what was going on, because they - -

22   they knew that you were doing these mal - - malfunction testing

23   and - -

24   A.    No.

25   Q.    They didn't?

1    A.    They did not know.

2    Q.    Okay.

3    A.    Because my report had not been written with those

4    statements in it yet.  I was - - I needed to update those

5    reports, and this statement would have been in there with my

6    updates that I was explaining to Mr. Parker, right before I was

7    fired.

8    Q.    Okay.  Did you make any other reports of fraud?

9    A.    No.

10   Q.    Okay, so we've got the one conversation with Mr. Parker in

11   October of 2019.  And then, the conversations with Parker and

12   Jim Dyer about funding in January, February of 2020?

13   A.    Yes.  And conversation with the engineers.

14   Q.    What was the conversation with the engineers?

15   A.    One with the engineer about the op amps, is lack of

16   understanding of the failure.  There was also another

17   conversation with some other engineers about a thermal cycling

18   failure that they didn't understand.  There was another

19   conversation with the same engineers about it not working at the

20   stated voltages that we claimed it would work at.

21   Q.    And again, these were all things that you were discovering

22   as you were doing your job?

23   A.    Yes.

24   Q.    Okay.  But you - - you consider that to be whistleblowing?

25   A.    No - - no, that's - - those are the things that made me go

Page 84

1    to Mr. Parker and tell him that we had no - - what are we going

2    to tell the customer?  We had no expectation that these things

3    would work.

4    Q.    When you talked to Mr. Parker in October 2019, and then

5    again in January and February of 2020, the conversation about

6    the funding.  Were you contemplating a whistleblower action at

7    that time?

8    A.    No - - no - - no.  I was reporting a problem that I knew

9    needed to be resolved.  So I wanted it to be fixed.  It had to

10   be fixed.

11   Q.    And again, that was your job.

12   A.    Yeah.

13   Q.    I m going to hand you what I ve marked as Exhibit eight.

14   Do you recognize Exhibit eight?

15          (Whereupon, Exhibit 8 was introduced in to the record

16          and is attached here to.)

17   A.    Yes.

18   Q.    Is this a document that you prepared?

19   A.    Yes.

20   Q.    And if you look at the second page of Exhibit eight, bottom

21   paragraph, you said,  The March 5, 2020 termination comes after

22   I made several whistleblower comments/concerns to my boss,

23   Steven Parker, where I saw wasted potential, negligence, or even

24   fraud.  And we've talked about those conversations  haven't we,

25   Mr. Stepanishen?

                                                    Page 85

1    A.    Yes.

2    Q.    Okay.   You have several new programs being developed and

3    manufactured for various customers where I warned about the

4    failures and told them that they had not been previously built,

5    tested, and embedded to ensure that they would work and that

6    they had some major flaws.   And then you go on,  I suggested

7    that BEI try to minimize the risk of the programs by quickly

8    building some BEI owned test lab rat engineering units and

9    running them through tests to ensure the design works and will

10   meet customer requirements, prior to building the customers

11   units.   And then the next - - and we're not going to read all

12   this, but the next couple of pages here, you go on to describe

13   the issues that you discovered while doing your malfunction

14   analysis.   Is that right, Mr. Stepanishen?

15   A.    Yes.

16   Q.    I want to talk about the last chance agreement that you

17   were given.   Mark that Exhibit number nine.   Do you recognize

18   Exhibit number nine?

19            (Whereupon, Exhibit 9 was introduced in to evidence

20            and is attached here to.)

21   A.    Yes.

22   Q.    And what is this document?

23   A.    The last chance agreement that I was forced to sign on

24   December 19, 2019.

25   Q.    Was there a meeting where this was given to you?

Page 86

1     and told me that nobody gets a bonus, which I found out to be a

2     lie.  They also told me my 1.75% was one of the highest merit

3     increases in the company, which I found was also a lie after

4     talking to some people.  Parker asked me how much I thought I

5     deserved, based on my performance last year, and I said,

6      Honestly, 8 or 9%, but I would have accepted four or five.

7     And he laughed at me.  And I said,  That's not a joke.  Do you

8     realize how much I do for this company?  I take on tasks that

9     nobody else wants and I've completed everything successfully.

10    Q.   So it wasn't too long after you were presented with this

11    employee performance appraisal that you were terminated.

12    A.   Yeah.

13    Q.   I asked in discovery about any reports or complaints to

14    government agencies about the claims alleged in the lawsuit,

15    your employment with BEI, or your termination of your employment

16    with BEI; do you remember that request?

17    A.   Yes.

18    Q.   Okay.  Have you made a report or complained to any

19    government agency about the claims alleged in this lawsuit?  I'm

20    not talking about the - - the lawsuit - - this lawsuit that you

21    filed.  But have you had - - did you make a report or complaint

22    to any other government agency about the claims alleged in this

23    lawsuit?

24    A.   I did file a claim with the EEOC.

25    Q.   okay.

Bushman Reporting          800-556-8974
A Veritext Company          www.veritext.com

```
1    A.    Immediately thereafter, because I thought at the time that
2    it was - - my termination was due to the anxiety issue.
3    Q.    Well, let's talk about that, because your lawsuit was filed
                th
4    April 16   of 2020.
5    A.    Okay.
                                              th
6    Q.    Okay? So you were terminated March 5   of 2020, and then
                                                       th
7    you filed your whistleblower lawsuit on April 16   of 2020.
8    A.    Let s see here - - whistleblower - - okay.
9    Q.    And that was filed in United States District Court, Eastern
10   District of Arkansas.  And you're looking at the complaint in
11   front of you.  And that's where you allege the fraudulent claims
12   against the government by BEI, and you also claimed that you
13   were terminated in retaliation for your whistleblowing
14   activities.
15   A.    Yes.
16   Q.    Is that right?
17   A.    Yes.
18   Q.    Okay.  You submitted your EEOC charge after that - - after
                th
19   April 16  .
20   A.    Okay.
21   Q.    I m going to mark your EEOC charge as the next exhibit.  So
22   I m handing you what I've marked is Exhibit number 12.  Do you
23   recognize Exhibit number 12?
24            (Whereupon, Exhibit 12 was introduced in to the record
25         and is attached hereto.)
```

Page 124

1    A.    Yeah.

2    Q.    What is Exhibit number 12?

3    A.    The charge of discrimination.

4    Q.    I'm going to read it, but at the bottom there it says,

5    digital - - digitally signed by Steven Stepanishen on June the

6    first of 2020, at 12:07pm EDT.  Do you see that?

7    A.    Yep.

8    Q.    Okay.  And did you digitally sign this document?

9    A.    Yes.

10   Q.    Okay.  And above your signature, it says,  I declare under

11   penalty of perjury that the above is true and correct.

12   A.    Yeah.

13   Q.    And you said,  I swear or affirm that I've read the above

14   charge and that it is true to the best of my knowledge,

15   information, and belief.   Is that correct?

16   A.    Yeah.

17   Q.    Okay.  And so this was an EEOC charge of discrimination,

18   which you submitted on June the first of 2020; right?

19   A.    Yes.

20   Q.    And the discrimination was based on retaliation disability;

21   correct?

22   A.    Yes.

23   Q.    Okay.  So you - - you're - - the particulars of the charge

24   were - - and I'm going to read from your charge that you

25   submitted,  I was hired in 1998 and work most recently as a

Page 125

1    submitted to the EEOC, under penalty of perjury, you said you

2    were terminated because you requested an accommodation, and that

3    that was retaliation.

4    A.    I did not say that was the only reason.  I did not say that

5    that was the only reason I was terminated.

6    Q.    All right.  And where did you say that?

7    A.    When I was speaking to him on the phone, I told him that I

8    had made that claim and that it was - - that I wanted it added

9    to my EEOC.  Because I had read court cases where that was a

10   potential EEOC claim.  And that's what I wanted to base my

11   charge of discrimination off of.  But he wouldn't do it.  He

12   would not add it and he told me he wouldn't.

13   Q.    So why did you sign it?

14   A.    Because that was the best I could get out of them.

                                st
15   Q.    So on June 1  of 2020, why did you believe you had been

16   terminated?  Was it for whistleblowing, or was it because of

17   your disability?

18   A.    I thought it was possibly a combination of both.  I was

19   more sure of the whistleblower claim and that's why I pushed

20   that the hardest.  I - - I had no faith in this EEOC charge, the

21   way he wrote it up.

22   Q.    I m going to hand you what I've marked as Exhibit number

23   13.

24            (Whereupon, Exhibit 13 was introduced in to the record

25            and is attached here to.)

Page 128

1  can make.   And I was like,  Okay, well I m going to check on

2  that.   After the meeting, it was too late.

3  Q.   Why did - - why did you submit it if you no longer believed

4  it?  Because you didn't sign it (talking over)

5  A.   In March.

6  Q.   Your EEOC charge was submitted, you signed it, and it was

                              st

7  submitted on June the 1   2020.

8  A.   Right. Well, I mean - -

9  Q.   Why did you sign it if you didn t believe it?

10  A.   I wanted the claim to be about the retaliation for the

11  whistleblowing, as well as the anxiety, okay?  And he steered me

12  down a corridor where it was only about that.

13  Q.   Well, let's continue reading from Exhibit number 13.   So

14  you talk about - - I'm picking up,  Winter 2015 I was demoted

15  and subjected to additional supervision after being placed in a

16  lower level position after returning from FMLA.  Also in the

17  fall/winter 2015, I was accused of doing drugs by the human

18  resource manager after FMLA in 2016 and late 2019, early 2020.

19  A.   Okay, so yeah, when I said that, I wasn't accused of doing

20  drugs by the human resource manager.  The human resource manager

21  told me that somebody else had accused me of doing drugs.  So

22  that's a misstatement.

23  Q.   I was prohibited from performing my job task travel.

24  A.   Yes.

25  Q.   Okay.  When - - when did that happen?

                                                    Page 132

```
1    I thought that that was my strongest claim.   And he dismissed
2    it.   And after I got off the phone with him, I did more research
3    and I found out that he should have, and there was nothing I
4    could do about it.
5    Q.   All right.   But you went ahead and you signed the charge on
6    June the first and submitted it to a federal agency.
7    A.   Yeah.
8    Q.   And when you signed that, under penalty of perjury, that
9    you were terminated in retaliation for requesting accommodation,
10   and because of your dis - - disability, you already had your
11   lawsuit filed.
12   A.   Yeah.
13   Q.   But you signed it and submitted it anyway.
14   A.   It doesn't say it's the only reason.
15   Q.   So at that time, on June first, when you submitted it, did
16   you think that your disability had something to do with your
17   termination?
18   A.   Yeah.
19   Q.   You still did?
20   A.   Yeah.
21   Q.   Okay.   What about today?   Do you still think your
22   disability had something to do with your termination?
23   A.   I don't know.   I don't know.   I can't - - like I said, a
24   lot of it doesn't make sense.   I did my job.   I did my job the
25   way I was supposed to do it and I did it the way I'd been doing
```

Page 141

175

1                           CERTIFICATE

2     STATE OF ARKANSAS      )
3                            )ss
4     COUNTY OF GRANT        )
5
6          I, Markaiah Raney, Certified Court Reporter, do hereby
7     certify that the foregoing proceedings on pages 1 through 175
8     are true; and that the foregoing proceedings were recorded
9     verbatim through the use of the Stenomask and thereafter
10    transcribed by me or under my direct supervision to the best of
11    my ability, taken at the time and place set out on the caption
12    hereto.

13         I FURTHER CERTIFY that I am neither counsel for, related
14    to, nor employed by any of the parties to the action in which
15    these proceedings were taken; and further, that I am not a
16    relative or employee of any attorney or counsel employed by the
17    parties hereto, nor financially interested, or otherwise, in the
18    outcome of this action.

19         WITNESS MY HAND AND SEAL this 6th day of March, 2024.

20
21
22
23
24
25
26
27    MARKAIAH RANEY
28    Certified Court Reporter #901
29
30
31
32
33

Page 175