IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

UNITED STATES OF AMERICA                                  PLAINTIFFS
*ex rel.* STEVEN STEPANISHEN, and
STEVEN STEPANISHEN, Individually

v.                              NO. 4:20-cv-414-BRW

BEI PRECISION SYSTEMS & SPACE
COMPANY, INC.                                            DEFENDANT

**BRIEF IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

**I.**
**Introduction**

During his time working as a reliability engineer at BEI Precision Systems &

Space Company, Inc. ("BEI"), Steven Stepanishen repeatedly behaved improperly

and unprofessionally toward his colleagues and the company's customers.  After

Stepanishen ignored requests from his supervisor to improve his behavior, BEI

presented Stepanishen with a "Last Chance Agreement" that made clear that

continued improper, unprofessional behavior would cause the loss of his job.  But

Stepanishen ignored that clear warning and less than three months later became

disruptive and unprofessional in a meeting with his colleagues.  Enough was

enough, so BEI terminated Stepanishen the day after that meeting for violating the

Last Chance Agreement.

Yet Stepanishen claims that his termination violated the False Claims Act's

("FCA") anti-retaliation provision, an allegation that he bases on issues about

optical encoders that he raised in the course of his work as a reliability engineer.[1] But that claim fails because Stepanishen cannot prove a prima facie case of retaliation under the FCA as required by the *McDonnell Douglas* analysis. He cannot prove a prima facie case because he cannot show that raising issues as part of his job as a reliability engineer was protected conduct. Nor can he prove that BEI knew that he engaged in protected conduct. And in the face of evidence that he was terminated because of his workplace behavior and his own claims that the termination was attributable to disability discrimination, Stepanishen cannot prove that his retaliation was motivated solely by any protected conduct. Stepanishen's claim also fails at the next step of the *McDonnell Douglas* analysis because BEI had a legitimate reason to terminate his employment, and Stepanishen cannot prove that BEI's reason was pretextual. Because no genuine issues of material fact remain on Stepanishen's FCA retaliation claim, BEI is entitled to summary judgment.

## II.
## Statement of Facts

**A.      Stepanishen's tenure and job duties at BEI.**

Stepanishen worked at BEI from 1998 to March 5, 2020, when he was terminated from his job as a reliability engineer. Ex. 1, Excerpts from Dep. of Stepanishen, at 13, 25.

---

[1] Stepanishen originally asserted three counts under the FCA, but the Court dismissed the first two counts at the pleading stage, leaving only the retaliation claim. Doc. 38.

Stepanishen described his role as being "in charge of conducting failure analysis on products that had failed or components that had test issues or failures" during acceptance or qualification testing.  *Id.* at 25, 31.  That work required him "to provide the root cause of the failure, . . . to explain[] what happened."  *Id.* at 26. Part of his failure analysis was to ensure that the quality of the product matched the customer's requirements.  *Id.* at 66.  Stepanishen filled "oversight functions" and acted as a "gatekeeper[] to ensure every aspect of the end item, from part selection, piece part procurement, the electrical and mechanical design, manufacturing processes and procedures, and acceptance and qualification testing did not pose a reliability risk, and that all contractual and technical requirements were met."  *Id.* at 66–67.

**B.    Stepanishen's termination from BEI.**

Stepanishen was terminated from his job at BEI following a series of incidents in which he acted inappropriately toward colleagues and customers.  Ex. 2, Parker Dec., at ¶ 16.  Stepanishen had multiple confrontations with co-workers. *Id.* at ¶ 5.  He sent emails to colleagues that upset them.  *Id.* at ¶ 6.  On October 30, 2019, Steven Parker, who was Stepanishen's supervisor, emailed him and asked him "to stop alienating the team and be part of the solution" and to stop sending "extended emails with everyone on blast" that harmed relationships and made resolving issues difficult.  *Id.* at ¶ 6; Ex. A to Ex. 2.  But Stepanishen did not abide by Parker's request.  On December 17, 2019, Stepanishen attended a lunch meeting with a customer at which Stepanishen became angry, banged on a desk, and ranted for several minutes.  Ex. 2 at ¶ 7.  After the meeting, Stepanishen argued with a

3

colleague. *Id.* Stepanishen had also had issues with his job performance, including failure to perform his job duties, missing issues with products, and showing up late and unprepared to meetings during which he looked at his phone rather than paying attention. *Id.* at ¶ 10.

After the December 17 incident, Parker met with Stepanishen and discussed these issues with his job performance. Ex. 2 at ¶ 11. At that meeting, Stepanishen signed a "Last Chance Agreement" as condition of continued employment at BEI. *Id.*; Ex. B to Ex. 2; Ex. 1 at 86. Under the Last Chance Agreement, Stepanishen agreed as a condition of continued employment (1) "to refrain from any disruptive behavior and [to] act in a professional manner at all times"; (2) "to follow direction from Program Management on all customer interactions"; (3) "to abide by all company rules and regulations"; and (4) "to keep personal issues from affecting the workplace and his productivity." Ex. 2 at ¶ 12; Ex. B to Ex. 2. Stepanishen further agreed that any violation of any of those four conditions would be "grounds for immediate termination" for two years. *Id.*

Despite agreeing that violating the conditions in the Last Chance Agreement would be grounds for termination, Stepanishen did not comply with those conditions. Ex. 2 at ¶ 14. On March 5, 2020, Wilf Schultheis, Director–Operations for BEI, reported that Stepanishen had behaved inappropriately in a meeting held the previous day. Stepanishen had used the meeting to complain "that his boss was already mad at him for not completing some documentation" and "that his boss had given him a bad appraisal." *Id.* at ¶ 14; Ex. C to Ex. 2. Because this report from

4

Schultheis showed a violation of the Last Chance Agreement, Parker terminated Stepanishen's employment later that day.  Ex. 2 at ¶ 15.  Parker and Lori Edwards—who worked in human resources for BEI—met with Stepanishen and informed him of his termination.  *Id*.  Edwards sent a letter to Stepanishen to confirm the termination.

Parker says that Stepanishen's employment was terminated solely because he violated the conditions of the Last Chance Agreement requiring him to refrain from disruptive behavior and to act professionally at all times.  Ex. 2 at ¶ 16.  Based on Parker's understanding of what happened at the March 4 meeting as recounted by Schultheis, Stepanishen had failed to act professionally and had disrupted a meeting with his colleagues through his unprofessional behavior.  *Id*. at ¶ 16.

## C.   Stepanishen's identification of issues with space encoders as part of his reliability engineer job duties.

BEI produces components called optical encoders, which are measuring devices that operate by transmitting an optical signal through a coded disk.  Ex. 1 at 26.  Sometime in late summer or early fall of 2019, Stepanishen was the only reliability engineer in the reliability department at BEI, a role in which he "was in charge of conducting failure analysis on space encoders that had failed or components that had test issues or failures."  *Id*. at 25.  A line of encoders called NanoSeries was going into production and experienced "a number of failures, both at the piece part component level, as well as at the encoder level," with several components of the encoders failing.  *Id*.  Stepanishen thus performed a failure

analysis investigation to determine "the root cause of the failure" so that the company would know what happened.  *Id*. at 25–26.

During Stepanishen's failure analysis investigation of the NanoSeries encoders, he struggled to explain the failures.  Ex. 1 at 26.  He asked an engineer working on the product if he had tested the encoder previously, and the engineer said that he had not.  *Id*.  Stepanishen was dubious and investigated further by talking to the engineering manager, Jim Dyer, who reported that the company had not built engineering models in the lab for debugging during the product development stage.  *Id*. at 27–28.  Stepanishen was concerned that BEI had told customers that the designs were "mature" when they were, in his view, not "ready for production" and required additional development.  *Id*. at 36.

Stepanishen discovered the issues with the encoders as part of his work as a reliability engineer.  Ex. 1 at 65–66; 67–68; 69; 84.  Stepanishen described himself as "in charge of writing the malfunction analysis, and as part of the malfunction analysis, [he had] to come up with, how did the failure occur?"  *Id*. at 76.  And Stepanishen reported the issue to Parker in October or November 2019 to get feedback on how to handle the issue in his malfunction report:

> I went to Steve Parker and I told him[,] I said, you know, we've got a problem, you know, we've got all these [NanoSeries] encoders that, you know, are in test and they're all failing.  And as part of my malfunction report, I need to list, you know, the root cause of the failure.  And engineering tells me that they've never built one of these, we've never debugged one.  And, of course, that's a contributory factor as to why they're failing because we never completed design work on it to debug it.  And I'm going to have to list that as a potential root cause and I said, I was a little incredulous, I said, How did—how did we sell these to these customers knowing that we hadn't finished the design work on

6

> them since they're expecting mature designs that are low risk of
> failure?

Ex. 1 at 60, 62.  Parker responded that he believed that building of prototypes had

been funded.  *Id*. at 60.  Stepanishen then continued his investigation by returning

to Dyer and confirming his earlier report regarding prototypes.  *Id*.

Stepanishen then returned to Parker three or four months later and reported

that "engineering has no idea why these things are failing.  I can't write a

malfunction report that says they're failing, we have no idea."  Ex. 1 at 62.  The

typical approach would be to discuss prototype testing and determine the difference

between the prototype and the production item, but Stepanishen could not do that

because of the lack of prototype testing.  *Id*.  Stepanishen did not know what to

write in his malfunction report and did not want to report that the product was not

adequately developed before BEI entered the contract.  *Id*. at 79.  Stepanishen did

not know if BEI ever delivered a defective optical encoder or even if a complaint was

made about them.  Ex. 1 at 46, 53, 83.

When Stepanishen went to Parker in late 2019 and early 2020, he was not

contemplating a whistleblower action.  Ex. 1 at 85.  Rather, he "was reporting a

problem that I knew needed to be resolved."  *Id*.  He agreed that making that report

was his job as a reliability engineer.  *Id*.  He did not report the issues to the

government.  *Id*. at 123.

**D.    Stepanishen's dual theories about the cause of his termination.**

When Stepanishen was fired in March 2020, he believed that it was an act of

disability discrimination because he had an issue with anxiety.  Ex. 1 at 123–24.  A

month later, in April 2020, he filed his complaint here, asserting an FCA retaliation claim, *id.* at 123, which requires him to show that his supposed whistleblowing was the sole cause of his termination.  Two months after he filed the complaint, Stepanishen submitted an EEOC charge claiming that he had been terminated because of a disability.  *Id.* at 125.

Stepanishen testified that he believed that his termination "was possibly a combination of both" whistleblowing retaliation and disability discrimination.  *Id.* at 128.  He wanted his EEOC charge to include both causes, but the EEOC representative would not include the retaliation basis.  *Id.* at 132, 141.

Parker says that he terminated Stepanishen based solely on his violation of the Last Chance Agreement and that the termination had nothing to do with the issues about the optical encoders.  Ex. 2 at ¶¶ 16, 17.  Parker did not understand the optical encoder issue to be anything but Stepanishen doing his job as a reliability engineer, and Stepanishen did not say that he planned to report the issue to the government or to help pursue an action under the FCA.  *Id.*

### III.
### Argument

Stepanishen does not have direct evidence of retaliation, so his FCA retaliation claim is subject to the *McDonnell Douglas* framework.  *United States ex rel. Strubbe v. Crawford Cnty. Mem'l Hosp.*, 915 F.3d 1158, 1168 (8th Cir. 2019) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  Under that framework, Stepanishen "bears the initial burden of establishing a prima facie case of FCA retaliation," and a failure to meet that burden entitles BEI to summary

judgment.  *Id.*  If Stepanishen can clear that initial burden, the burden shifts to BEI to "articulate a legitimate reason" for the termination.  *Id.*  Once BEI makes that showing, the burden returns to Stepanishen to show that the proffered reason is a pretext and "that retaliatory animus motivated the adverse action," with failure to meet that burden again entitling BEI to summary judgment.  *Id.*  Stepanishen cannot meet either burden.

**A.      Stepanishen cannot establish a prima facie case of FCA retaliation.**

Making a prima facie case of FCA retaliation requires Stepanishen to show that (1) he engaged in protected conduct; (2) BEI knew that he engaged in protected conduct; (3) BEI retaliated against him; and (4) "the retaliation was motivated solely" by the protected activity.  *Strubbe*, 915 F.3d at 1168.  Stepanishen cannot meet his burden on elements (1), (2), and (4).

**A.1.      Stepanishen did not engage in protected conduct.**

Showing that he engaged in protected conduct requires Stepanishen to show that his report to Parker about the optical encoders was both "in furtherance of an FCA action" and "aimed at matters which are calculated, or reasonably could lead, to a viable FCA action."  *U.S. ex rel. Ray v. Am. Fuel Cell & Coated Fabrics Co.*, No. 1:09-CV-01016, 2015 WL 874824, at *5 (W.D. Ark. Mar. 2, 2015) (Hickey, J.) (citing *Schuhardt v. Washington Univ.*, 390 F.3d 563, 566 (8th Cir. 2004)).

Stepanishen did not report the encoder issues to Parker in furtherance of an FCA action or for any other purpose related to the FCA.  When asked if he made his report in the role of a whistleblower, Stepanishen responded, "no—no—no."  Ex. 1 at 85.  Rather, he was doing his job "by reporting a problem that [he] knew needed to

be resolved." *Id*.  So when Stepanishen went to Parker, Stepanishen's concern was how to report his findings in the malfunction report that it was his job to prepare, not to report fraud. *Id*. at 60.  Faced with similar testimony that the employee "was just trying to help the company" in *Ray*, that court concluded that the employee did not raise issues about humidity in a fuel cell manufacturing plant in furtherance of an FCA action.  2015 WL 874824, at *5.  This Court should reach the same result here, where Stepanishen was doing his job, not reporting fraud.

As the *Ray* court noted, many "courts that have dealt with the 'in furtherance of' condition have found that merely grumbling to an employer about regulatory violations or reporting wrongdoing to supervisors is not acting in furtherance" of an FCA action.  2015 WL 874824, at *6 (citing cases); *see also Strubbe*, 915 F.3d at 1169 (complaints to hospital board about "financial wrongdoing" and investigations into hospital finances were not protected activity because there was no evidence that they were done in furtherance of an FCA violation).  An internal grievance may serve as the basis of an FCA lawsuit only if there is "some evidence that the employee performed the 'investigation for' or provided 'assistance in' an FCA action." *Ray*, 2015 WL 874824, at *6.  The employee in *Ray* failed to provide the necessary evidence because his actions failed to show a "distinct possibility of litigation." *Id*.  "Nor did his internal grievances point to an instance where [his employer] sold the government a fuel cell that was defective as a result of the humidity in the plant." *Id*.  Stepanishen's case suffers from the same failing—he has shown no distinct possibility of litigation communicated in his conversations

with Parker, and he did not know at any point if BEI ever sold a defective optical encoder or even if a complaint was made about them.  Ex. 1 at 46, 53, 83.

Because Stepanishen cannot show that he engaged in a protected activity, he cannot satisfy an essential element of his FCA retaliation claim.  The Court should therefore grant summary judgment for BEI.

**A.2.   Stepanishen cannot prove that BEI knew that he was engaged in protected conduct.**

The knowledge prong of the FCA retaliation analysis requires Stepanishen to prove that BEI was on notice of the "distinct possibility" of FCA litigation.  *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 188 (3d Cir. 2001).  Such notice "is essential because without knowledge an employee is contemplating a False Claims Act suit," there is no basis for concluding that the employer acted in retaliation for protected conduct.  *Id.* (citation omitted).  "Merely grumbling to the employer about . . . regulatory violations does not satisfy the requirement—just as it does not constitute protected conduct in the first place."  *Id.* (citation omitted).  Ultimately, to satisfy this prong, Stepanishen must show that BEI reasonably feared that he was contemplating an FCA action.  *Id.* at 188.

"Not all complaints by employees to their supervisors put employers on notice of the 'distinct possibility' of False Claims Act litigation."  *Hutchins*, 253 F.3d at 190.  For example, an employee who reported to his supervisors that the company was billing the government without properly substantiating the charges did not put the company on notice of potential FCA claims because he never characterized his concerns about the unsubstantiated charges as illegal or referenced an FCA action.

*Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. 1994). Similarly, a telephone company dispatcher's complaints to her supervisor about falsified reports made to avoid reimbursements for disrupted service did not put the company on notice of potential FCA litigation. *McKenzie v. BellSouth Telecomm., Inc.*, 219 F.3d 508, 515 (6th Cir. 2000). The complaints gave no notice because they were not directed "toward an investigation into fraud on the federal government" and did not indicate that the dispatcher planned to pursue an FCA claim or inform the government of fraudulent conduct. *Id.* Likewise, in *Hutchins*, a law firm employee's complaints about Westlaw and Lexis billing practices did not put the firm on notice of potential FCA litigation because the employee never threatened to report the practices to a government authority and did not file an FCA suit until after he was terminated. 253 F.3d at 193.

Stepanishen's case is similar. BEI could not have known or anticipated that Stepanishen planned to file FCA litigation because he did not contemplate it himself when he made his reports to Parker. Ex. 1 at 85. Stepanishen did not report the encoder issues to any government authority before he was terminated; the only government report he could cite was an EEOC charge alleging disability discrimination that he made three months after he was terminated. *Id.* at 123. Nor did Stepanishen tell Parker that he planned to pursue an FCA claim or present one to the government. Ex. 2 at 17. And like the law firm employee in *Hutchins*, Stepanishen did not file his FCA suit until after his termination. Ex. 1 at 124.

Stepanishen simply cannot prove that BEI had notice that he was engaging in protected activity.

Again, Stepanishen cannot prove an essential element of his FCA retaliation claim.  The Court should grant summary judgment.

**A.3.   Stepanishen cannot prove that his termination was motivated solely by protected activity.**

While most claims subject to the *McDonnell Douglas* framework have a causation element, "the 'motivated solely by' causal link required as part of the prima facie case of a FCA retaliation claim is tighter than that required in other types of retaliation and discrimination claims where [courts] use the same *McDonnell Douglas* framework."  *Sherman v. Berkadia Com. Mortg. LLC*, 956 F.3d 526, 532 (8th Cir. 2020).  *Sherman* establishes that a plaintiff fails to show a genuine issue of material fact when the proof is equivocal on this issue.  While Sherman produced evidence that company management was at times critical of his suggestions regarding regulatory compliance, the record also contained "evidence that Sherman's supervisors disapproved of other parts of his job performance," particularly his inability to work with colleagues and his coddling of underperforming employees.  *Id.* at 533.  Even "in the light most favorable to Sherman, [that] evidence would not allow a reasonable jury to find that Berkadia fired Sherman solely for protected activity," making summary judgment appropriate on Sherman's FCA retaliation claim.  *Id.*

Summary judgment is also appropriate on Stepanishen's FCA retaliation claim for the same reason.  In fact, Stepanishen has less evidence than Sherman

did.  Unlike Sherman, Stepanishen has no evidence that BEI was critical about his reports of the coder issues.  But like Sherman's supervisors, Parker had concerns about Stepanishen's performance that led to the Last Chance Agreement.  Ex. 2 at 11.  And Parker fired Stepanishen because he violated the Last Chance Agreement by behaving badly at the March 4 meeting as reported by Schultheis.  Ex. 2 at 15.  As in *Sherman*, this undisputed evidence that Parker fired Stepanishen because of his unprofessional behavior will not allow a reasonable jury to find that Stepanishen was fired solely for protected activity.  *See Hinton v. Integra Lifescienes Holdings Corp.*, No. 18-CV-00244-SRB, 2023 WL 6793927, at *7 (W.D. Mo. Sept. 11, 2023) (applying *Sherman* and granting summary judgment on an FCA retaliation claim because the employer presented evidence that plaintiff's supervisors disapproved of aspects of her job performance unrelated to her FCA activities).

In fact, not even Stepanishen believes that he was terminated *solely* for protected activity.  Stepanishen testified that he believed that his termination "was possibly a combination of both" whistleblowing retaliation and disability discrimination.  Ex. 1 at 128.  Accordingly, his EEOC charge—made under penalty of perjury two months after he filed his complaint here—claims that his termination was due to disability discrimination.  *Id*. at 125.  Having alleged multiple causes for his termination, Stepanishen cannot prove that retaliation for protected FCA activity was the sole cause of his termination.  *See, e.g.*, *Robertson*, 32 F.3d at 953 (plaintiff's Texas state-law claim that he "was discharged for the sole reason" that he refused to violate the law was properly dismissed because his separate "assertion

14

that he was fired for another reason" precluded a claim that his refusal to violate the law was the sole cause of his termination).[2]  Stepanishen's assertion of multiple causes for his termination precludes his FCA retaliation claim that his protected activity was the *sole* cause.

Stepanishen thus cannot prove that his termination was motivated to any extent by his complaints about the encoders, and his job performance and his claim that he was terminated because of a disability preclude him from showing that FCA retaliation was the sole cause of his termination.  BEI is entitled to summary judgment.

## B.  BEI had a legitimate reason to terminate Stepanishen because of his breach of the Last Chance Agreement, and he cannot show that reason was pretextual.

Stepanishen's inability to prove a prima facie case of FCA retaliation dooms his claim, leaving no need to move to the next step of the *McDonnell Douglas* analysis in which BEI has the burden of showing a legitimate reason for terminating Stepanishen.  But Stepanishen's claim fails at this stage of the analysis, too, because BEI had a legitimate reason to terminate Stepanishen, and he cannot prove that the stated reason was pretextual.

---

[2] The Fifth Circuit did not apply this reasoning to the plaintiff's FCA retaliation claim—discussed in the preceding section of this brief—because the Fifth Circuit does not apply the "motivated solely" causation standard that applies in the Eighth Circuit.  *See Nesbitt v. Candler Cnty.*, 945 F.3d 1355, 1361 & n.2 (11th Cir. 2020) (discussing circuit split over FCA retaliation causation standard, including Fifth Circuit's adoption of "but-for" standard, and noting Eighth Circuit's "motivated solely" standard as unique).

BEI's burden to present a legitimate reason for Stepanishen's termination is one of production, not persuasion; it "can involve no credibility assessment." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993). In other words, BEI is required only to put forth some evidence of a legitimate reason for the dismissal at this stage to satisfy the *McDonnell Douglas* test. Evidence that an employee's behavior at meetings fell short of the employer's expectations satisfies this burden by showing a legitimate reason for termination. *See Main v. Ozark Health, Inc.*, 959 F.3d 319, 324 (8th Cir. 2020) (employer met burden in employment discrimination action by presenting evidence that employee was terminated because of rude and insubordinate behavior in a meeting). Here, the evidence shows that Parker terminated Stepanishen because of his repeated bad behavior in the workplace. Parker raised Stepanishen's treatment of colleagues in October 2019. Ex. 2 at ¶ 6. When Stepanishen had an outburst in December 2019 in which he banged on a desk and carried on angrily for several minutes, Parker presented Stepanishen with the Last Chance Agreement, which made clear that Stepanishen would be fired if he acted disruptively or unprofessionally. *Id.* at ¶ 11. Three months later, Stepanishen disrupted another meeting in violation of the Last Chance Agreement, so Parker fired him. *Id.* at ¶ 15. BEI thus had a legitimate reason to fire Stepanishen.

BEI's evidence that it had a legitimate reason to terminate Stepanishen after he violated the Last Chance Agreement returns the burden to Stepanishen, requiring him to rebut BEI's reason for dismissal by demonstrating that it is a

16

pretext and that the real reason for the dismissal was FCA retaliation.  *Strubbe*, 915 F.3d at 1168.  At this stage, the courts do not "second-guess an employer's personnel decisions."  *Haigh v. Gelita USA, Inc.*, 632 F.3d 464, 471 (8th Cir. 2011).  Nor do courts "sit as a super-personnel department that reexamines an entity's business decisions."  *Wilking v. County of Ramsey*, 153 F.3d 869, 873 (8th Cir. 1998).  Rather, the "inquiry is limited to whether the employer gave an honest explanation of its behavior."  *Id.* (citations omitted).  So "when an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not [the court's] province to decide whether that reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination."  *Id.*

Proving that his improper workplace behavior was a pretext under the *McDonnell Douglas* analysis requires Stepanishen to present evidence, not "mere speculation, conjecture, or fantasy."  *Putnam v. Unity Health Sys.*, 348 F.3d 732, 734 (8th Cir. 2003).  But Stepanishen has nothing but speculation that his termination was in retaliation for his reports to Parker about the encoders. Stepanishen did not consider his reports to be whistleblowing and did not intend them that way.  Ex. 1 at 85.  And Stepanishen has no proof that BEI terminated him for any reason other than his improper behavior in the workplace that led to the Last Chance Agreement and led to his termination after he behaved badly at the March 4 meeting.

Stepanishen's inability to prove that BEI's legitimate reason for terminating his employment were pretextual entitles BEI to summary judgment on Stepanishen's FCA retaliation claim.

### IV.
### Conclusion

The Court should grant summary judgment for BEI on Stepanishen's FCA retaliation claim because he cannot prove a prima facie case of retaliation and because he cannot show that BEI's stated reason for terminating him—his repeated instances of improper workplace behavior—was pretextual.

Regina A. Young (96161)
WRIGHT, LINDSEY & JENNINGS LLP
200 West Capitol Avenue, Suite 2300
Little Rock, Arkansas 72201-3699
(501) 371-0808
FAX: (501) 376-9442
ryoung@wlj.com

*Attorneys for Defendant*

3082734-v