IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

UNITED STATES OF AMERICA                                       PLAINTIFFS
*ex rel.* STEVEN STEPANISHEN, and
STEVEN STEPANISHEN, Individually

v.                      NO. 4:20-cv-414-BRW

BEI PRECISION SYSTEMS & SPACE
COMPANY, INC.                                               DEFENDANT

**LOCAL RULE 56.1 STATEMENT
OF UNDISPUTED MATERIAL FACTS**

Defendant BEI Precision Systems & Space Company, Inc. ("BEI") submits this statement of undisputed material facts in support of its motion for summary judgment as required by Local Rule 56.1:

1. Stepanishen worked at BEI from 1998 to March 5, 2020, when he was terminated from his job as a reliability engineer. Ex. 1, Excerpts from Dep. of Stepanishen, at 13, 25.[1]

2. Stepanishen described his role as being "in charge of conducting failure analysis on products that had failed or components that had test issues or failures" during acceptance or qualification testing. *Id.* at 25, 31.

3. That work required Stepanishen "to provide the root cause of the failure, . . . to explain[] what happened." *Id.* at 26.

---

[1] Exhibits referenced in this statement are attached to BEI's motion for summary judgment.

4. Part of Stepanishen's failure analysis was to ensure that the quality of the product matched the customer's requirements. *Id.* at 66.

5. Stepanishen filled "oversight functions" and acted as a "gatekeeper[] to ensure every aspect of the end item, from part selection, piece part procurement, the electrical and mechanical design, manufacturing processes and procedures, and acceptance and qualification testing did not pose a reliability risk, and that all contractual and technical requirements were met." *Id.* at 66–67.

6. Stepanishen was terminated from his job at BEI following a series of incidents in which he acted inappropriately toward colleagues and customers. Ex. 2, Parker Dec., at ¶ 16.

7. Stepanishen had multiple confrontations with co-workers. *Id.* at ¶ 5. He sent emails to colleagues that upset them. *Id.* at 6.

8. On October 30, 2019, Steven Parker, who was Stepanishen's supervisor, emailed him and asked him "to stop alienating the team and be part of the solution" and to stop sending "extended emails with everyone on blast" that harmed relationships and made resolving issues difficult. *Id.* at ¶ 6; Ex. A to Ex. 2.

9. Stepanishen did not abide by Parker's request. On December 17, 2019, Stepanishen attended a lunch meeting with a customer at which Stepanishen became angry, banged on a desk, and ranted for several minutes. Ex. 2 at ¶ 7. After the meeting, Stepanishen argued with a colleague. *Id.*

10. Stepanishen had also had issues with his job performance, including failure to perform his job duties, missing issues with products, and showing up late

and unprepared to meetings during which he looked at his phone rather than paying attention.  *Id.* at ¶ 10.

11.     After the December 17 incident, Parker met with Stepanishen and discussed these issues with his job performance.  Ex. 2 at ¶ 11.

12.     At that meeting, Stepanishen signed a "Last Chance Agreement" as condition of continued employment at BEI.  *Id.*; Ex. B to Ex. 2; Ex. 1 at 86.

13.     Under the Last Chance Agreement, Stepanishen agreed as a condition of continued employment (1) "to refrain from any disruptive behavior and [to] act in a professional manner at all times"; (2) "to follow direction from Program Management on all customer interactions"; (3) "to abide by all company rules and regulations"; and (4) "to keep personal issues from affecting the workplace and his productivity."  Ex. 2 at ¶ 12; Ex. B to Ex. 2.

14.     Stepanishen also agreed in the Last Chance Agreement that any violation of any of those four conditions would be "grounds for immediate termination" for two years.  *Id.*

15.     Despite agreeing that violating the conditions in the Last Chance Agreement would be grounds for termination, Stepanishen did not comply with those conditions.  Ex. 2 at ¶ 14.

16.     On March 5, 2020, Wilf Schultheis, Director–Operations for BEI, reported that Stepanishen had behaved inappropriately in a meeting held the previous day.  Stepanishen had used the meeting to complain "that his boss was

already mad at him for not completing some documentation" and "that his boss had given him a bad appraisal." *Id.* at ¶ 14; Ex. C to Ex. 2.

17. Because this report from Schultheis showed a violation of the Last Chance Agreement, Parker terminated Stepanishen's employment later that day. Ex. 2 at ¶ 15.

18. Parker and Lori Edwards—who worked in human resources for BEI— met with Stepanishen and informed him of his termination. *Id.* Edwards sent a letter to Stepanishen to confirm the termination.

19. Stepanishen's employment was terminated solely because he violated the conditions of the Last Chance Agreement requiring him to refrain from disruptive behavior and to act professionally at all times. Ex. 2 at ¶ 16.

20. Based on Parker's understanding of what happened at the March 4 meeting as recounted by Schultheis, Stepanishen had failed to act professionally and had disrupted a meeting with his colleagues through his unprofessional behavior. *Id.* at ¶ 16.

21. BEI produces components called optical encoders, which are measuring devices that operate by transmitting an optical signal through a coded disk. Ex. 1 at 26.

22. Sometime in late summer or early fall of 2019, Stepanishen was the only reliability engineer in the reliability department at BEI, a role in which he "was in charge of conducting failure analysis on space encoders that had failed or components that had test issues or failures." *Id.* at 25.

23. A line of encoders called NanoSeries was going into production and experienced "a number of failures, both at the piece part component level, as well as at the encoder level," with several components of the encoders failing. *Id*.

24. Stepanishen thus performed a failure analysis investigation to determine "the root cause of the failure" so that the company would know what happened. *Id*. at 25–26.

25. During Stepanishen's failure analysis investigation of the NanoSeries encoders, he struggled to explain the failures. Ex. 1 at 26. He asked an engineer working on the product if he had tested the encoder previously, and the engineer said that he had not. *Id*.

26. Stepanishen was dubious and investigated further by talking to the engineering manager, Jim Dyer, who reported that the company had not built engineering models in the lab for debugging during the product development stage. *Id*. at 27–28.

27. Stepanishen was concerned that BEI had told customers that the designs were "mature" when they were, in his view, not "ready for production" and required additional development. *Id*. at 36.

28. Stepanishen discovered the issues with the encoders as part of his work as a reliability engineer. Ex. 1 at 65–66; 67–68; 69; 84.

29. Stepanishen described himself as "in charge of writing the malfunction analysis, and as part of the malfunction analysis, [he had] to come up with, how did the failure occur?" *Id*. at 76.

5

30. Stepanishen reported the issue to Parker in October or November 2019 to get feedback on how to handle the issue in his malfunction report:

> I went to Steve Parker and I told him[,] I said, you know, we've got a problem, you know, we've got all these [NanoSeries] encoders that, you know, are in test and they're all failing. And as part of my malfunction report, I need to list, you know, the root cause of the failure. And engineering tells me that they've never built one of these, we've never debugged one. And, of course, that's a contributory factor as to why they're failing because we never completed design work on it to debug it. And I'm going to have to list that as a potential root cause and I said, I was a little incredulous, I said, How did—how did we sell these to these customers knowing that we hadn't finished the design work on them since they're expecting mature designs that are low risk of failure?

Ex. 1 at 60, 62.

31. Parker responded that he believed that building of prototypes had been funded. *Id*. at 60.

32. Stepanishen then continued his investigation by returning to Dyer and confirming his earlier report regarding prototypes. *Id*.

33. Stepanishen then returned to Parker three or four months later and reported that "engineering has no idea why these things are failing. I can't write a malfunction report that says they're failing, we have no idea." Ex. 1 at 62.

34. The typical approach would be to discuss prototype testing and determine the difference between the prototype and the production item, but Stepanishen could not do that because of the lack of prototype testing. *Id*.

35. Stepanishen did not know what to write in his malfunction report and did not want to report that the product was not adequately developed before BEI entered the contract. *Id*. at 79.

36. Stepanishen did not know if BEI ever delivered a defective optical encoder or even if a complaint was made about them. Ex. 1 at 46, 53, 83.

37. When Stepanishen went to Parker in late 2019 and early 2020, he was not contemplating a whistleblower action. Ex. 1 at 85. Rather, he "was reporting a problem that I knew needed to be resolved." *Id*.

38. Stepanishen agreed that making that report was his job as a reliability engineer. *Id*.

39. Stepanishen did not report the issues to the government. *Id*. at 123.

40. When Stepanishen was fired in March 2020, he believed that it was an act of disability discrimination because he had an issue with anxiety. Ex. 1 at 123–24.

41. Two months after he filed the complaint in this action, Stepanishen submitted an EEOC charge claiming that he had been terminated because of a disability. *Id*. at 125.

42. Stepanishen testified that he believed that his termination "was possibly a combination of both" whistleblowing retaliation and disability discrimination. *Id*. at 128.

43. He wanted his EEOC charge to include both causes, but the EEOC representative would not include the retaliation basis. *Id*. at 132, 141.

44. Parker says that he terminated Stepanishen based solely on his violation of the Last Chance Agreement and that the termination had nothing to do with the issues about the optical encoders. Ex. 2 at ¶¶ 16, 17.

45. Parker did not understand the optical encoder issue to be anything but Stepanishen doing his job as a reliability engineer, and Stepanishen did not say that he planned to report the issue to the government or to help pursue an action under the FCA. *Id.*

        Regina A. Young (96161)
        WRIGHT, LINDSEY & JENNINGS LLP
        200 West Capitol Avenue, Suite 2300
        Little Rock, Arkansas 72201-3699
        (501) 371-0808
        FAX: (501) 376-9442
        ryoung@wlj.com

        *Attorneys for Defendant*