**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS**

| | |
|---|---|
| **UNITED STATES OF AMERICA *ex rel.* Steven Stepanishen, and STEVEN STEPANISHEN, individually,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**BEI PRECISION SYSTEMS & SPACE COMPANY, INC.,**<br><br>**Defendant.** | **Civil Action No. 4:20-cv-414-BRW** |

## <u>DECLARATION OF STEVEN STEPANISHEN</u>

I, Steven Stepanishen, do hereby swear, affirm and attest as follows, based upon my personal knowledge of the matters contained herein:

1.      My name is Steven Stepanishen, and I am over the age of 18 and duly qualified to execute this declaration.

2.      I am a resident and domiciliary of the State of Arkansas.

3.      I was employed by BEI Precision Systems & Space Company, Inc. ("Defendant"), to work as a reliability engineer from 1998 until my employment was terminated in March of 2020. At the time of my termination, I had been the Manager of the Reliability Department for over five years.

4.      The purpose of this declaration is to clarify and simplify the facts contained in my deposition testimony. The facts contained in this declaration do not conflict with

my deposition testimony; this declaration is intended to supplement my earlier testimony, not replace it.

5.     My employment with Defendant lasted over twenty years. Until the fall of 2019, I only ever received good performance reviews and had receive numerous written and verbal commendations on my job performance from Defendant. *See* Commendations, attached as Ex. E to Stepanishen's Resp. to Mot. for Summ. J.

6.     In 2018, Defendant reduced their workforce and cut my department significantly without input from me or any other employee familiar with the department's current workload. Defendant transferred one reliability engineer from my department to Program Management and let the other reliability engineers in my department go, leaving me to perform the duties formerly shared by five reliability engineers.

7.     In the fall of 2019, several program directors simultaneously demanded that I immediately focus my complete attention to complete an urgent task within their program. This is an unrealistic expectation for any one employee to meet, so I raised some concerns about this to my direct supervisor, Steven Parker, and some efforts were made to make sure my workload did not get too difficult. Some of these efforts were more effective than others, but I was able to get the job of five people done without much difficulty and with zero complaints from Defendant or Defendant's customers.

8.     In late summer or early fall of 2019, I began working on failure analyses for multiple different government contracts concerning Defendant's newest line of optical encoders, which was part of Defendant's new NanoSeries line of encoders.

9.     I'm going to try not to get too technical or off-topic, but to understand the timeline of events leading to my termination, it's necessary to have a basic

understanding of how critical it is to ensure that these high-reliability space products function as expected. These products are used in space satellites that perform vital functions for the United States government in the interests of national defense, weather prediction, and monitoring pollution levels in the oceans and atmosphere. The products must be sufficiently robust to survive a violent rocket launch and then function correctly for many years in a harsh space environment where repairs or replacement is impossible. The failure of one of these devices in space could disable the satellite, so Defendant's customers demand products that will reliably work as expected in space. According to standard space industry practice and Defendant's usual operating procedures, high reliability space products go through several levels of design verification. These verifications include design reviews, various engineering and reliability analyses, environment testing, building and testing prototype units, at a minimum. Once the verifications are completed and successful, manufacturing and acceptance testing to produce deliverable spaceflight hardware can begin.

10.    Broadly speaking, a major part of my job is to ensure the design, the parts lists, the manufacturing processes and procedure, and the acceptance testing on the products all comply with Defendant's customers' contracts' quality and reliability requirements, and that all performance requirements are met.

11.    If a product or one of its piece parts fails to perform as expected, I am responsible for performing a failure investigation and troubleshooting to find the root cause of the anomaly, then I determine the appropriate corrective action and make appropriate modifications to prevent the problem from reoccurring. I document

everything in a formal malfunction/failure analysis report and present the contents of this report to the customer.

12.     Before manufacturing the products, Defendant's engineers develop a prototype to work out bugs or correct other electrical or mechanical issues in the overall design of the product. This prototype is subjected to a battery of electrical, mechanical, and environmental tests to prove the design is sufficiently robust to meet its requirements for its mission life. Once a working model of the product has been built and passed its verification tests, the design is considered mature, or finalized, and Defendant starts manufacturing individual models for specific customers based on the debugged design. Then, if the product, or a piece part of the product, fails to meet its performance specifications or behaves in an unexpected or anomalous way, the program manager contacts me to initiate a failure investigation to identify the cause of the anomaly and determine the appropriate corrective actions to ensure the specific model worked like it was supposed to before being delivered to the customer. *See* Dep. of Steven Stepanishen ("Dep. Stepanishen") 28:24–31:21, attached as Ex. B to Stepanishen's Resp. to Mot. for Summ. J.

13.     I performed failure analyses on several NanoSeries encoder models, as well as for several piece parts that were used on NanoSeries encoders, for specific government customers in late summer early fall 2019. The encoders were built to be delivered directly to NASA or to subcontractors for The United States Space Force.

14.     The encoders that failed all failed spectacularly and all for different reasons. The failures were not specific to an individual device, but instead were failures due to their design, so the failures were common for all similarly configured units. Since

it was a common practice or me to interview the engineer on the program during a failure investigation, I reached out to the engineering team to ask if similar anomalies were seen before in any similarly configured prototypes and was told that no prototypes had ever been built.

15.     This information was alarming because it was common knowledge that these precision encoders would not be fully functional or meet their performance specifications until such debugging had been performed and changes made to account for the different configurations. Without being subjected to, and passing, the verification testing described above, there is no reasonable expectation that he design is robust enough to operate without fault for the life of its specified mission. I went to speak with Jim Dyer, Defendant's Engineering Manager, to ask why the prototypes were not built and tested during the development stage, and he told me that the engineering department had requested funding to build and test prototypes of the specific models under contract so the design could be debugged but the funding request was denied.

16.     Because the products were sensitive and fiddly to build, it was extremely unlikely that we could produce functional encoders without specific model prototypes to work from. Without subjecting the prototypes to the rigorous prototype verification testing, there is no way to ensure the product will meet all its contractual requirements. Dyer told me he had requested a smaller amount of funding to perform an engineering analysis, but that funding was denied as well.

17.     Because the encoders that malfunctioned had not been previously built or debugged, the lack of prior debugging was a contributory root cause of the failures, which is something I knew I would have to list as a reason for the encoders' failure in

my malfunction report for the customer. I was particularly concerned because I knew Defendant had advertised the NanoSeries encoders as low-risk, mature designs, but a design with no associated prototype build to debug and verification test cannot be considered a mature design and the risk of an orbit failure increases significantly.

18.      I raised my concerns with Steven Parker in October of 2019. We had an informal meeting in his office in which I told him about the failures I encountered on the encoders and said I was worried about what the customers would say when they found out we weren't working off a mature design. He told me he'd look into it and to keep plugging away as best I could. At that point, I had no belief that Defendant was intentionally committing fraud and I believed that there was some mix-up that would be resolved after Parker looked into the issue. *See* Dep. Stepanishen 62:3–24.

19.      Around that time, my workplace environment began to change. Previously, I would have described the workplace culture as friendly. We all had a sort of professional comradery with each other.

20.      I can appear to have a pretty blustery and loud personality at times, but I never yell, bang on tables, or argue with customers or coworkers. I enjoyed my job, I enjoyed going to work each day and I always got along with my co-workers. Also, because of the cancer I had a few years ago, the radiation left my voice gravelly and rough. As a result, I have to project my voice in a way that I've been told can be perceived as intimidating or aggressive sometimes because my rough voice can make me sound angry even when I'm not. I know this about myself and I always tried to temper my voice to make sure it remained professional, and until October of 2019, everyone I worked with was understanding of this limitation. Dep. Stepanishen 97:11–

19. During my time with Defendant, I saw numerous other employees shout, insult, or commit acts of physical or verbal aggression without any repercussions. One of these incidents is described in Paragraph 28.

21.    I was never disciplined for being unprofessional or disruptive, and neither my co-workers nor any of Defendant's customers ever lodged a complaint about my work product or professionalism. I loved my job and was proud of the pivotal role I played in ensuring the safety of our country and our allies. I couldn't imagine working anywhere else, so I made sure I was a valued employee by taking on whatever task I could and maintaining a friendly professional relationship with my co-workers and management. *See* Commendations.

22.    Around the same time I spoke to Parker about the lack of prototypes, I began to notice a distinct chilling toward me at work. It no longer felt like friendly comradery; I would describe it as a distant hostility. I had been performing my job function for thirty years, and been with Defendant for over twenty, and my methods and skills had only become better and more effective. Despite still finding and eliminating hardware problems on Defendant's products within my deadlines, starting in the fall of 2019, I no longer received praise or rewards; instead I received criticism with no way to resolve it. I attempted to modify my methods and behavior to avoid these criticisms, but was met with a group of employees who all seemed to be working together to make things difficult for me.

23.    I started to get reprimanded for my voice and attitude at work, but I had not changed my personality or professionalism in any way. Interpersonal interactions that were not a problem previously suddenly became a professionalism issue. For

example, in late October, maybe a week or two after my meeting with Parker, Parker sent me an email reprimanding me for "sensationalizing" issues and "alienating" my co-workers. *See* Ex. A to Decl. of Steven Parker ("Decl. Parker"), ECF No. 47-2. This email comes up again below.

24.     Another employee told Steven Parker that I was sitting on a report that should have been finalized (when it was not ready to be finalized due to delays beyond my control) and Parker chastised me for not finishing the report on time through email while I was traveling on behalf of the company. The employee who made the report was a former reliability engineer whom I had managed, and he should have been aware the report could not be finalized because I had not received the parts to be tested as required by our system. Not only did I expect a former reliability engineer to know I couldn't finalize the report, I didn't understand why he didn't just ask me about the report instead of going over my head to Parker. I went into this incident in a lot more detail in my deposition. *See* Dep. Stepanishen 71:7–73:23.

25.     Parker brought up issues with my professionalism following this incident, but I wasn't sure what I had been unprofessional about, so I asked for clarification. He wasn't able to give me a specific answer, so then I asked for sensitivity training so that I could handle work conflict in the way that would please Parker. He refused to provide the training. *See* Dep. Stepanishen 97:11–19. I even asked him to accompany me on my next failure investigation interview so that he could see me interact with Defendant's customers and give me feedback on how to improve. He refused this, as well.

26.     As another example, I was prevented from going on an important work trip to one of Defendant's parts suppliers. I described the circumstances in detail in my

deposition (133:1–136:3), but the main point I want to make about the whole ordeal is that I followed specific advice from my supervisors and was hung out to dry because of it. I was faced with an ethical dilemma about reporting an issue to the customer, sought and followed advice from my co-workers and Parker, and when the customer distorted the information down the chain, neither my co-worker nor Parker backed me up or set the record straight. They let me take the blame for someone else's miscommunication.

27.     I'll use the meeting that led to my Last Chance Agreement as another example. I described that meeting in detail in my deposition (87:5–90:14), but I want to add some details that Defendant raised in its Motion for Summary Judgment. In Parker's declaration, he accuses me of "bang[ing] on a desk, and carr[ying] on angrily for several minutes." At the outset, Parker wasn't in the meeting and is not describing his personal observations, nor does he provide a source for this hearsay. I never banged on the desk, nor did I lose my temper with the customer or my co-workers. When the customer asked me to rewrite a report to include some unnecessary information, I simply explained why I hadn't included it, but when it became obvious the customer wanted it included, I said okay without any sort of fist pounding or aggression. The customer asked if I could make the changes by the end of the day, but it was already mid-afternoon and I knew it would take four or five hours, so I said I couldn't get it done that day but would have it completed by noon the next day.

28.     When the program manager, David Dam, hung up the phone with the customer, Dam began to curse at me and told me that I should have done as the customer requested and not argued. I stayed calm, but I did ask Dam to please stop cussing at me. I also reminded Dam that he had asked me not to spend much time on

this customer's contract because there was not much funding left, which was why I left the information out in the first place. I also explained that I hadn't argued, but simply explained why I didn't think the information was necessary. I was surprised by Dam's overreaction, and another meeting participant expressed surprise that Dam had such a vehement response to a completely normal interaction.

29.     After the meeting, I told Parker about Dam's cursing and aggressive behavior. When I was called into a meeting with Parker and Human Resources the next day, I believed it was about Dam's behavior, but instead I was accused of unprofessionalism and presented with the Last Chance Agreement. I asked what specifically I had done to warrant this level of discipline, but neither Parker nor Lori Edwards, the HR representative, provided me with an answer. Nor could they point to a specific company rule or guideline that I had violated. I was not allowed to tell my side of the story. It wasn't until I read Parker's declaration (ECF No. 47-2) that I realized I had been accused of angrily banging on a table and arguing with a co-worker.

30.     Despite Edwards's claim of conducting a thorough investigation, other employees who were present at the meeting believed I had behaved professionally and had been treated unfairly. *See* Letter from Raymond Reed, attached as Ex. D to Stepanishen's Resp. to Mot. for Summ. J.

31.     Neither Parker nor Edwards could tell me what I had done with any sort of specificity, so I again requested some sort of training so that I could avoid the sort of negative interaction that was bothering them so much. Parker refused again. Dep. Stepanishen 97:11–19.

32.     Once I was certain I was being targeted (around the beginning of November to mid-November), I adjusted my behavior to prevent any issues being misreported and used against me.  I became overly cautious and went out of my way not to do anything that could be considered as unprofessional or disruptive.  But that's when Parker increased surveillance on my day-to-day tasks. I was now required to submit weekly status reports to both Parker, which were forwarded to Dam who was not my supervisor and had no business reading them, and they were heavily scrutinized for anything that could be considered misconduct.

33.     In fact, Parker was able to distort many of these reports to the point that Defendant is able to use them as evidence in this lawsuit. For example, in his declaration, Parker accuses me of not meeting performance expectations because I couldn't prioritize competing needs, but, as I said above, I was the sole reliability engineer and Parker did nothing to assist me in handling the competing demands of three department heads, all of whom demanded my immediate attention at the same time, I was still found to be at fault for "struggl[ing] to prioritize the competing requests from program management." *See* Feb. 10, 2020, Performance Review, attached as Ex. F to Stepanishen's Resp. to Mot. for Summ. J. Notably, Dam was the department manager, as well as one of the department heads who demanded I prioritize his work, but refused to use his managerial authority to prioritize his own department's requests until I contacted Parker about the issue.

34.     Parker also accused me of missing or arriving late to meetings and looking at my phone when I was there. The meetings he's describing were voluntary meetings in which the attendees drift in and out based on their availability. I was by no means the

only absentee or late arrival. I recall looking at my phone one time during these meetings, and that was to google "manufacturers of Space qualified mirror platings" during a discussion of a NanoSeries mirror plating failure.  The information I found was eventually sent to other team members as a suggested corrective action for a NanoSeries failure we were discussing.

35.     As a final example, after I signed the Last Chance Agreement, I was instructed to commit timecard fraud. Fortunately, I had been with the company for long enough not to fall into the trap. I took the issue up the chain and reported the supervisor that had told me to improperly bill my time, but the supervisor who instructed me to commit the fraud was not disciplined or rebuked, nor was there any fuss over the fact that an employee of Defendant would push for that sort of misappropriation of customer money. *See* Dep. Stepanishen 57:7–59:9. It's worth noting that David Dam, the program manager who cursed at me, was the supervisor who told me to commit timecard fraud.

36.     All of these incidents seem inconsequential and could possibly be explained away individually but taken together, along with their timing, it was obvious that there was a targeted campaign against me. Most of the events I described above produced some sort of documented paper trail when they happened. What I mean by that is that when Parker sent me a formal email asking about a supposedly delinquent report instead of talking to me on the phone, or when I had to sign a Last Chance Agreement based on one angry and disgruntled employee's witness, Defendant was ensuring that all of these incidents were documented to build a case against me.

37.     While the documentation greatly exaggerates or completely misstates the events, the fact that the events were documented at all leads me to believe Defendant's

upper management had decided to fire me and were simply looking for a "legitimate" way to get rid of me before I became a bigger problem.

38.     Meanwhile, the NanoSeries encoders continued to fail. By February of 2020, I still wasn't sure how to write the failure analyses because I didn't have a prototype to compare to the individual models built for our customers. I was feeling the effects of workplace hostility pretty heavily at this point, and I was worried that being unable to produce a good failure analysis would only add fuel to the fire in terms of being out of Defendant's good graces.

39.     As part of another failure investigation at the same time, Parker prevented me from performing a failure investigation on a new supplier's manufacturing facility. Defendant is required to perform New Supplier Facility Audits on all new suppliers to ensure all of Defendant's suppliers have the appropriate equipment to build part capable of passing space level qualification testing, but Defendant had not conducted a New Supplier Audit on this particular manufacturer. When I told Parker that I planned to include the lack of New Supplier Audit in my failure investigation, Parker sent an email stating that he was pulling me from the site investigation and sending an engineer instead. This is against company policy because it's a conflict of interest, so I replied to the email to remind Parker that this wasn't a good idea. Parker replied with the email attached as Exhibit A to his declaration and I was pulled off the investigation entirely. Incidentally, Parker assigned the investigation to a program manager who was handling some of the NanoSeries programs, which is another conflict of interest.

40.     I had another meeting with Parker in which I was more aggressive about needing more information about how to write the reports. In this meeting, I told Parker

that engineering still couldn't explain some of the NanoSeries encoder failures except that the design wasn't mature and that I couldn't guarantee the product would work. In this meeting, I expressed my concerns about Defendant's having committed fraud for the first time. I stated that I was particularly concerned about the lack of mature and vetted design prior to submitting contract proposals for government contracts. Previously, I thought it looked like fraud, but I never voiced the concern because I wanted to give Defendant the benefit of the doubt and give Parker time to fix the issue.

41.     I want to be very clear about this: the February 2020 meeting was the first time I that told Steven Parker that I believed Defendant had committed fraud in selling products without mature designs and that I planned to include that information in the report that I would send to Defendant's customers, who included NASA, a government agency, and other government subcontractors. Prior to that, I had only suggested that what Defendant had done could possibly be consider potential fraud or at a minimum possibly negligence.

42.   I told Parker it was in the company's best interest to come clean to and inform the customer of the encoder failures, and to inform them that part of the reason for the failures was from the lack of design debugging. I also suggested that Defendant quickly fund, build, and debug some company-owned prototype encoders instead of using customer owned hardware. I specifically let him know that I would be including all of Defendant's refusals to debug the design into the malfunction reports.

43.   Immediately after this conversation, I was stripped of two programs and Parker reassigned the responsibility for the programs and the tasks of completing

failure reports to the same employee from Paragraph 21 who reported my supposed delinquent report to Parker.

44.   Around two weeks later, on March 4, 2020, I attended a meeting with the employee who accused me of having a delinquent report to Parker. During the meeting, which was an informal, voluntary meeting attended by only Defendant's employees, I reminded the person who reported me to Parker of the internal operation procedures that did not allow me to close the report yet and requested that he ask for my status from me personally before reporting something incorrect to my boss, who was already mad me. I said something about not wanting another bad performance review when Wilf Schultheis, who was in the meeting, reminded me that the meeting was not the appropriate forum for complaining about my bosses and to keep to the topic at hand. (These sorts of reminders were unfortunately pretty commonplace for many of these meeting attendees during my twenty years with Defendant—because the meetings are casual, we all got off-topic on touchy subjects, and before this meeting it had never been an issue, and certainly nobody had been fired because of it.)

45.   The next day, Edwards and Parker came to my office first thing in the morning, probably around 7:30 am. Edwards and Parker told me I had been terminated because I violated the Last Chance Agreement in the meeting the previous day, presented me with a termination letter, and had me escorted from the building. When I asked what I had done, Parker said Wilf Schultheis reported me to Human Resources for unprofessional behavior the prior day.

46.   I want to clarify one last thing about my deposition testimony. Defendant's attorney asked me at one point whether I believe my anxiety had anything to do with my

termination and I responded "yeah." Dep. Stepanishen 141:15–20. I believe that my anxiety was related to my termination in that I believe Defendant was exploiting my disability to create an environment in which I would feel pressured to lash out, leading to a pretextual reason to terminate my employment. I do not believe I was terminated *because* of my disability, but I do believe that my disability was used as a pressure point leading to my termination. *See* Dep. Stepanishen 144:17–25.

**PURSUANT TO 28 U.S.C. § 1746, I VERIFY UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed this 23rd day of April, 2024.

*Steven Stepanishen*

**STEVEN STEPANISHEN**